# Illinois Official Reports

## Appellate Court

> ### *Bennett v. GlaxoSmithKline LLC*, 2020 IL App (5th) 180281

| | |
|---|---|
| Appellate Court Caption | EDGAR BENNETT; TROY BLANKENSHIP; ALMA BROMLOW; DIANNE CAMERON; ROBERT CLEGGETT; JENNIE GABEL; MARIBEL GANDY; REGINA HART; BRUCE HOWARD, Individually and on Behalf of Shirley Howard, Deceased; BARBARA HUFF; FRANCES HUGHES; MAGGIE JOHNSON; HAROLD KELLEM; SIMON KRIZAN; EUDOSIA LOPEZ; ROBERT McDOUGALD; DORIS PARSONS; ALBERT PHILLIPS; KATHY COOPER, Individually and on Behalf of Janet Price, Deceased; PHILLIP RAWLS; HOWELL RENEAU; DONALD RUTLEDGE; ROBERT SEARCIE; JAMES SPEARS, Individually and on Behalf of Eulace Spears, Deceased; CLAYTON TAYLOR; PETER VALDEZ; JOANN WALKER-BEY; DELORIS WILLIAMS; NINA WILSON; WILLIE WILSON; ALVIN L. WRIGHT; and GEORGE ZAEHRINGER, Plaintiffs, v. GLAXOSMITHKLINE LLC, SMITHKLINE BEECHAM CORPORATION, McKESSON CORPORATION, and DOES 1 THROUGH 5, Inclusive, Defendants (Steven M. Johnson, P.C., d/b/a The Johnson Law Firm, and Johnson Law Firm Avandia Clients, Appellants; Michael L. Baum, Estate of David Troupe, Plaintiffs' Steering Committee in the Avandia Multidistrict Litigation, and GlaxoSmithKline LLC, Appellees). |
| District & No. | Fifth District<br>No. 5-18-0281 |
| Filed | April 21, 2020 |
| Decision Under Review | Appeal from the Circuit Court of St. Clair County, No. 09-L-621; the Hon. Andrew A. Gleeson, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed in part and reversed in part.<br>Cause remanded. |
| | |
| Counsel on<br>Appeal | Edward X. Clinton Jr., of the Clinton Law Firm, LLC, of Chicago, for appellant Steven M. Johnson, P.C. |
| | Michael L. Baum (*pro hac vice*) and Bijan Esfandiari (*pro hac vice*), of Baum, Hedlund, Aristei & Goldman, P.C., of Los Angeles, California, for appellees Michael Baum, G. Erick Rosemond, and Estate of David Troupe. |
| | W. Jason Rankin, of HeplerBroom, LLC, of Edwardsville, for appellee GlaxoSmithKline, LLC. |
| | |
| Panel | JUSTICE CATES delivered the judgment of the court, with opinion.<br>Justices Moore and Wharton[*] concurred in the judgment and opinion. |

## OPINION

¶ 1    Attorney Steven M. Johnson, his law firm, and his clients, the Johnson Law Firm Avandia clients (JLF plaintiffs), appeal from the circuit court's orders directing that payment of a "common benefit fund" expense and payment of cocounsel's attorney fees be made from the plaintiffs' settlement fund. For the following reasons, we affirm in part and reverse in part.

¶ 2                                I. BACKGROUND

¶ 3    The history of this case is reflected in a lengthy record of more than 7000 pages, including 1334 pages filed "under seal." We have not attempted to summarize all the proceedings. The facts and the procedural history necessary to our resolution of the issues on appeal are set forth in this disposition.

¶ 4                        A. The Actions in St. Clair County

¶ 5    On November 16, 2009, a "bundled" complaint (Gabel v. GlaxoSmithKline, No. 09-L-621 (Cir. Ct. St. Clair County)) was filed against defendant, GlaxoSmithKline LLC (GSK), on behalf of 32 individual plaintiffs who alleged they suffered cardiovascular injuries after taking Avandia. Avandia is a medication that is made and marketed by GSK. It is prescribed to help

---

[*]Justice Chapman was originally assigned to participate in this case. Justice Wharton was substituted on the panel subsequent to Justice Chapman's retirement and has read the briefs and listened to the recording of oral argument.

control blood sugar levels in individuals living with type 2 diabetes. Steven M. Johnson, an attorney based in Houston, Texas, affiliated with two local attorneys, David Jones and Robert Jones, for the purpose of filing these cases in the circuit court of St. Clair County. On April 15, 2010, the circuit court approved Johnson's application to appear *pro hac vice* in the cases but designated David Jones as lead counsel.

¶ 6    On August 30, 2010, the trial court granted plaintiffs' motion to amend their complaint to add 62 new plaintiffs to the lawsuit. Subsequently, Johnson filed two other "bundled" complaints against GSK in St. Clair County, alleging cardiovascular injuries resulting from the ingestion of Avandia (Reagan v. GlaxoSmithKline, No. 11-L-228 (Cir. Ct. St. Clair County), and Meier v. GlaxoSmithKline, No. 11-L-318 (Cir. Ct. St. Clair County)).[1] In all, cases were filed on behalf of 205 plaintiffs and representatives of deceased plaintiffs.

¶ 7    The parties agreed to a "bellwether" approach to manage the cases. In this approach, plaintiffs' trial counsel and GSK's counsel each selected two plaintiffs whose cases would be used to assess the viability and monetary value of the Avandia cases. Under the case management order, plaintiffs' top bellwether pick would be tried first, followed in order by defendant's top bellwether pick, plaintiffs' second bellwether pick, and finally defendant's second bellwether pick. The first bellwether case was initially scheduled for trial in September 2012.

¶ 8    During the spring of 2012, attorney Johnson traveled to California to attend an Avandia litigation conference led by the coordinating counsel for the Avandia Multidistrict litigation (MDL).[2] The conference was held after the bulk of the Avandia MDL cases had been resolved. The purpose of the conference was to make an array of work product information and materials developed during the Avandia MDL cases available to attorneys who had Avandia cases remaining in state courts. The information and materials, dubbed "trial in a box," included model pleadings and pretrial motions, a database of indexed documents and expert reports on causation and liability, and access to relevant experts. In exchange for receipt of a flash drive containing the "trial in a box" information and materials, participating attorneys agreed to abide by protective orders relative to the work product and to pay an assessment of 7% of the gross settlement of their Avandia claims to the Avandia common benefit fund (CBF). The 7% comprises contributions of 3% from each plaintiff's gross settlement or verdict and 4% of the attorney fees. The CBF was established in 2009, pursuant to a pretrial order of the MDL court.[3]

---

[1]The records in the Reagan and Meier cases are not included in the record on appeal.

[2]On October 16, 2007, the United States Judicial Panel on Multidistrict Litigation created MDL No. 1897 (Avandia MDL) and centered the litigation in the federal district court for the Eastern District of Pennsylvania. The Avandia MDL consolidated all product liability cases arising from the development and marketing of Avandia that were pending in the federal district courts throughout the United States. As a result of the consolidation, pretrial proceedings were coordinated in a single federal district in the Eastern District of Pennsylvania. See *In re Avandia Marketing Sales Practices*, 658 F. App'x 29, 30-31 (3d Cir. 2016).

[3]In 2009, the MDL court entered pretrial order 70, establishing the Avandia CBF. It allowed attorneys who voluntarily signed a participation agreement to receive MDL common benefit work product in exchange for payment of a 7% assessment of the gross monetary recovery for all claims in which the participating attorney had an interest. *In re Avandia Marketing Sales Practices*, 658 F. App'x at 30-31.

¶ 9    During the Avandia litigation conference, Johnson met with attorney Michael Baum and attorney Erick Rosemond. Baum and Rosemond had both handled Avandia cases in the MDL litigation. Baum and Rosemond had signed the participation agreement and agreed to pay the CBF assessment for all cases in which they had an interest. Both had also performed common benefit work for the MDL. After meeting with Johnson, Baum and Rosemond agreed to prepare and act as trial counsel in the St. Clair County bellwether cases.

¶ 10    In a series of e-mail exchanges, with subject line "fee split," that occurred on June 20, 2012, and June 21, 2012, Baum and Johnson discussed a fee arrangement whereby Baum would receive 75% of the attorney fees from any settlement or verdict in the bellwether trials and 10% of the attorney fees from recoveries in the non-trial-pick cases, after deduction of the CBF assessment. During the e-mail exchange, Johnson learned that Baum intended to use the "trial in a box" work product materials because the first bellwether trial was only months away. Baum informed Johnson that all verdicts and settlements in all Avandia cases would be subject to the CBF assessment. When Johnson asked why he should pay the CBF assessment, Baum explained that the assessment could not be avoided because he and his trial team would be using the Avandia work product materials in pretrial preparations and during the trial. The e-mail exchange regarding the sharing of fees and expenses was not formalized into a written fee-sharing agreement. Neither Johnson nor Baum contacted any of the JLF plaintiffs to obtain the written consent of each plaintiff for Baum's representation and for the fee-sharing arrangement.

¶ 11    In June 2012, the trial court approved Baum's application to appear *pro hac vice* on behalf of the plaintiffs in the cases bundled under Gabel v. GlaxoSmithKline, No. 09-L-621 (Cir. Ct. St. Clair County). Baum and his team selected David Troupe and Labranche Valerius as plaintiffs' bellwether picks. GSK selected Alan Sargent and Harold Kellem as its bellwether picks. Troupe's case was slated as the initial bellwether case. His case was rescheduled for trial in January 2013.

¶ 12                            B. The Settlement Agreement

¶ 13    While Baum was completing the trial preparations for Troupe's case, Johnson agreed to participate in a mediation with GSK attorneys, facilitated by retired circuit judge Lloyd Cueto. Johnson did not consult with Baum before agreeing to mediation. During a mediation session on December 10, 2012, Johnson and GSK attorneys reached an "agreement in principle" to settle the claims of all 205 plaintiffs in the Gabel, Meier, and Reagan cases. Under the proposed settlement, GSK agreed to pay *up to* $10.5 million. Johnson agreed to secure executed releases from a threshold number of 156 plaintiffs. If Johnson was unable to secure releases from the threshold number of participating plaintiffs, then GSK had the option to withdraw from the entire settlement. If Johnson provided executed releases from at least 156 plaintiffs, but less than 195 plaintiffs, GSK would receive a reimbursement of a specific per-case average for each plaintiff who did not agree to settle. If counsel provided executed releases from at least 195 of the 205 plaintiffs, GSK would pay the full settlement amount, without any reimbursement. Under the proposed agreement, Johnson was responsible for determining a method for allocating the settlement funds among the plaintiffs and recommending a proposed allocation to each plaintiff. Johnson agreed to allocate the settlement funds to participating plaintiffs and participating law firms in a manner "consistent with ethical and professional obligations."

¶ 14    On December 12, 2012, GSK notified the circuit court that a settlement had been reached in the Gabel, Meier, and Reagan cases. On that date, the court ordered a stay of the proceedings and set a status conference for March 4, 2013.

¶ 15    C. The Rise of Disputes Over Allocations, Fees, and Expenses

¶ 16    On December 20, 2012, bellwether plaintiff David Troupe terminated Johnson as his attorney. Troupe indicated that he had not been informed about the settlement negotiations and thought his case would be resolved through a trial. Troupe further indicated that he made several attempts to contact Johnson about the settlement but Johnson did not reply to Troupe's calls and e-mail messages. Troupe did not terminate Baum. Troupe asked Baum to remain on Troupe's case.

¶ 17    On December 27, 2012, attorney Patricia Murphy and her firm entered an appearance on behalf of Troupe, joining Baum as one of Troupe's attorneys of record. On that same day, Troupe filed an emergency motion to reinstate his trial date. Troupe requested an expedited trial date due to his age and declining physical health.

¶ 18    On January 7, 2013, GSK filed a motion to enforce the settlement agreement and to stay litigation pending completion of the settlement process. In its motion, GSK argued that during the mediation on December 10, 2012, Johnson represented that he had the authority to settle all the pending Avandia cases, including Troupe's case, and that the settlement process should be allowed to continue as envisioned by the mediation. GSK also opposed Troupe's request for any trial because he was a part of the settlement group.

¶ 19    On January 11, 2013, Troupe filed a response in opposition to GSK's motion to enforce the settlement. Therein, Troupe set forth a detailed statement of his reasons for declining to settle his case and terminating Johnson. According to the pleadings and affidavits, on December 11, 2012, Linda Lowry, a member of Johnson's staff, phoned David Troupe to notify him that a settlement had been reached. Lowry talked with Troupe about the approximate amount of his settlement. Lowry indicated that Johnson believed Troupe's case could be settled for approximately $200,000. Troupe and his family were concerned because they believed the case would be resolved through a trial. Following this conversation, Troupe made several attempts to contact Johnson directly, and Johnson did not return the calls or respond to the e-mail messages. After getting no response from Johnson, Troupe contacted Baum to consult with him about the amount of the proposed settlement. Baum called and e-mailed Johnson, but Johnson did not return those calls or e-mail. Johnson did not join in the conference calls scheduled by Baum's office. In a supplemental pleading, Troupe noted that, according to the settlement terms, a certain number of plaintiffs could opt out without disrupting the settlement and that his participation was not a required term of the agreement. Troupe attached copies of the e-mail exchanges and declarations from Baum and Rosemond to support his pleadings.

¶ 20    On January 15, 2013, the trial court ordered Baum and Johnson to attend a mediation conference with Judge Cueto. On January 22, 2013, Johnson, David Jones, and Robert Jones filed a joint motion to withdraw as counsel for David Troupe. There is no indication that a ruling was ever made on the motion to withdraw.

¶ 21    On January 23, 2013, the court issued an order directing the parties to mediate before February 5, 2013. The court also scheduled an evidentiary hearing on GSK's motion to enforce the settlement.

¶ 22    On February 12, 2013, GSK filed a notice to withdraw its motion to enforce the settlement agreement. The notice offered no explanation of the reasons that the motion was withdrawn.

¶ 23    On February 20, 2013, Johnson filed a motion to compel arbitration relative to the settlement agreement. Johnson asserted that the settlement agreement provided for binding arbitration of any controversy among the parties regarding the terms, conditions, and enforcement of the agreement. Johnson argued that there was evidence GSK was attempting to "abandon, ignore and/or scuttle" the settlement agreement entered on December 20, 2012. Johnson attached an e-mail from GSK's counsel, dated February 11, 2013, indicating that Johnson had represented that Troupe would participate in the settlement and that Johnson was not able to meet this term of the settlement.

¶ 24    Meanwhile, Baum reached a separate settlement with GSK on behalf of David Troupe. On February 22, 2013, Johnson filed a petition to intervene in the settlement that Baum obtained for David Troupe. Johnson asserted that Baum had settled Troupe's Avandia claims with GSK for $900,000 and that Troupe had not satisfied his attorney lien obligation to Johnson. Johnson sought to have the full settlement amount deposited in the registry of the court until the lien obligations could be sorted out in arbitration. Johnson also sought damages from Troupe for fraud.

¶ 25    On February 27, 2013, Johnson filed an emergency motion to disqualify Baum as counsel in the Gabel cases. Initially, Johnson asserted that there was no written agreement between Johnson and Baum regarding the representation of the JLF plaintiffs or the sharing of fees or costs. Johnson further asserted that Baum had violated the rules of professional conduct in that he proceeded to settle the claims of David Troupe to the detriment of the remaining plaintiffs and that the Troupe settlement jeopardized the settlement agreement obtained for the JLF plaintiffs. There is no indication that Johnson ever sought a hearing or ruling on his emergency motion.

¶ 26    On March 1, 2013, GSK filed a motion opposing arbitration. GSK argued that the settlement agreement was not a valid contract and that, as a result, there was no agreement to arbitrate. GSK restated its assertion that Johnson had misrepresented his authority to enter into a settlement agreement on behalf of David Troupe and the other JLF plaintiffs.

¶ 27    On March 4, 2013, the trial court conducted a brief hearing regarding Johnson's motion to compel arbitration. Following the hearing, the court ordered the parties to attend another mediation session with Judge Cueto. The record is silent as to what occurred during the next 11 months.

¶ 28    On February 6, 2014, Johnson filed a notice to withdraw his petition to intervene in the Troupe settlement. The notice offered no explanation for the withdrawal of the petition.

¶ 29    On February 14, 2014, Johnson and the JLF plaintiffs filed a motion to enforce the settlement agreement. Johnson claimed that the parties had reached an agreement "as to all material and essential terms" of the settlement during the mediation on December 10, 2012, and that the plaintiffs had fully performed their obligations under the settlement agreement. Johnson asserted that he had secured releases from 165 participating plaintiffs as of July 2013 and that he had reached the threshold of 195 participating plaintiffs within the 18-month period

set forth in the settlement agreement. Johnson argued that GSK was therefore obligated to tender the sum of $10.5 million as set forth in the settlement agreement. Johnson claimed that GSK failed to deposit the agreed amount into an escrow fund, and he asked the court to order GSK to pay the full amount of the settlement directly to the Johnson Law Firm for disbursement.

¶ 30 On May 7, 2014, GSK filed its motion in opposition to the JLF plaintiffs' motion to enforce the settlement. GSK again argued that the motion should be denied because there was no valid agreement to settle. GSK stated that, a few weeks after the December 10, 2012, mediation, it learned that Johnson lacked authority to enter into a settlement agreement on behalf of all plaintiffs, including David Troupe.

¶ 31 On June 13, 2014, the circuit court heard arguments on the JLF plaintiffs' motion to enforce the settlement agreement. During the hearing, Joseph Bartholomew appeared on behalf of the JLF plaintiffs. Bartholomew argued that an enforceable settlement had been reached and that the JLF plaintiffs ought to receive their settlement allocations. Bartholomew noted that David Troupe had settled his case with GSK and that there was a dispute regarding whether Troupe's settlement ought to be paid out of the $10.5 million settlement fund. Bartholomew claimed that this issue should be arbitrated. GSK voiced its objection to the arbitration, arguing that there was no enforceable settlement and thus no agreement to arbitrate. The circuit court found that the parties had agreed to begin a process to settle the cases and that the issues regarding the settlement allocations should be arbitrated. The court entered the following written order:

> "The Court finds that a binding and enforceable agreement to settle was made on December 10, 2012. Any disputes as to the terms of this agreement are to be resolved by arbitration pursuant to said agreement. Transcript of hearing on June 13, 2014[,] to be kept under seal."

¶ 32 On July 11, 2014, GSK filed a motion to reconsider the order of June 13, 2014. GSK argued that the court's written finding that there was a binding and enforceable settlement was inconsistent with the court's oral finding that there was an agreement to begin a process to settle. GSK also argued that, if the court found that an agreement to settle existed, the court should hold an evidentiary hearing to determine whether Johnson breached the purported agreement by failing, among other things, to make allocations for bellwether plaintiffs, Troupe and Valerius, and for failing to provide GSK with a list of the plaintiffs who had agreed to participate in the settlement. On August 25, 2014, the circuit court issued an order directing the parties to make another attempt to mediate the disputed issues prior to scheduling a hearing on GSK's motion to reconsider.

¶ 33                         D. The Orders Approving the Settlement Allocations

¶ 34 On January 27, 2015, the trial court conducted a hearing. At the outset, the circuit court noted that the parties had participated in court-ordered mediation and arbitration with respect to the issues in the case. The court also noted that the parties met with the court in chambers prior to this hearing. The court indicated an order resolving all issues was pending before the court. The court stated as follows:

> "I have before me an order that I believe resolves these issues that are pending before the Court. It does it in a way that's fair and impartial to all parties and appears to be in the best interests of the plaintiffs and the defendant in this matter. *** I believe I have an enforceable order in front of me, although I understand that this order when I enter

it this morning is over the objection of the plaintiffs but I do find the order that's before me to be appropriate. As I said, I believe it's in the best interest of all the parties and so I am going to enter it this morning."

Attorney Bartholomew, appearing for the JLF plaintiffs, asked the court to show that the order was entered over the objection of Johnson and the JLF plaintiffs. Bartholomew did not identify or explain the objection on the record. The court noted that counsel and the court talked "about a number of things off the record in chambers" but did not elaborate on the conversations. The in-chambers proceedings were not memorialized in a transcript or a bystander's report.

¶ 35    On that same day, the court entered a written order resolving all claims in the Gabel, Meier, and Reagan cases. Therein, the court noted that, following the resolution of Troupe's claim, the sum of $10,076,418.68 remained undistributed. The court indicated that Johnson had provided GSK with confidential releases executed by each plaintiff and that each plaintiff had agreed to accept a specified allocation. According to the order, the sum of $100,000, less attorney fees, costs, and liens, had been allocated for each plaintiff who had experienced a heart attack, and the sum of $25,000, less attorney fees, costs, and liens, had been allocated to each plaintiff who had not suffered a heart attack. According to the order, the claims of three additional plaintiffs, Labranche Valerius, Jack Dinges, and Albert Merlino, were included in the settlement. Dinges and Merlino were clients of the Jones law firm and accepted non-heart-attack shares of $25,000. Valerius, the other bellwether plaintiff, was a client of Baum and settled his case for $200,000. GSK was directed to hold 7% of the total settlement funds, $735,000, in reserve, pending resolution of the issue regarding the CBF allocation. For the next several months, a lien resolution administrator negotiated outstanding medical liens that had been filed by Medicare, Medicaid, and other health insurance providers against the individual plaintiffs.

¶ 36    On March 24, 2015, the circuit court issued an order amending its order of January 27, 2015. The court noted that three additional JLF plaintiffs agreed to settle their claims and accept the non-heart-attack shares of $25,000. The court further noted that the shares of three other JLF plaintiffs had been reclassified from heart attack shares to non-heart-attack shares.

¶ 37    Three additional orders were entered on April 15, 2015. The court approved the joint stipulation filed by GSK and Labranche Valerius and dismissed Valerius's claims against GSK with prejudice. Pursuant to a stipulation filed jointly by GSK and attorneys Bartholomew and Johnson, the court entered an order dismissing with prejudice the claims of 53 plaintiffs, among them David Troupe. The court also entered an order directing that $348,795.68 be held in the court's registry pending further orders regarding unresolved issues. These issues included whether Baum was entitled to an award of $242,140, as his share of attorney fees in the non-trial-pick cases, and who was responsible for paying more than $35,000 owed for expert witness fees and court reporting services.

¶ 38    During a status hearing on June 3, 2015, the court was advised that all releases had been delivered, but that the JLF plaintiffs had not yet received their payments. Baum's counsel reminded the court that $348,795 was being held in the court's registry pending a resolution of the dispute over Baum's fees for the non-trial-pick cases and the dispute over who was responsible to pay costs totaling $35,079 for court reporting services and an expert's fee. After hearing the arguments of counsel, the court entered an order directing Johnson to make the initial distribution of settlement funds to all plaintiffs within 14 days of the order. The court also directed counsel to agree to a hearing date for resolution of the remaining dispute

involving attorney fees. In a subsequent order entered July 15, 2015, the court, over Johnson's objection, referred the fee dispute for binding arbitration. Johnson filed an interlocutory appeal of the order, and all matters were stayed pending a disposition of the appeal. On March 1, 2016, this court entered an order finding that the attorneys had not agreed to arbitrate the fee issue and vacating the circuit court's order to arbitrate. *Gabel v. GlaxoSmithKline, LLC*, No. 5-15-0322 (2016) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 39        Meanwhile, on July 23, 2015, Johnson filed a motion for summary judgment, requesting that the funds being held in the court's registry be released to him as attorney fees. In his motion, Johnson claimed that he was contractually entitled to 40% of the gross settlement of the claims of 198 JLF clients, for a total of $4.17 million in attorney fees. Johnson asserted that pursuant to the orders entered January 27, 2015, and March 24, 2015, the court awarded him $2,329,200 in attorney fees, instead of the $4.1 million to which he was contractually entitled. Johnson also claimed that Baum was not entitled to any portion of the funds held in the court's registry because Baum disrupted the settlement process when he requested a trial for plaintiff Troupe, instead of simply opting out of the settlement agreement. Johnson further claimed that Baum had placed the interests of Troupe above the other plaintiffs by negotiating a separate settlement for Troupe that was to be allocated from the $10.5 million settlement fund. Johnson also asserted that Baum had several conflicts of interest because of Baum's alleged support of the position of the Avandia plaintiffs' steering committee (PSC), who argued that the JLF plaintiffs were required to contribute to the Avandia CBF. Johnson asked the court to disallow Baum's asserted claim to any fees from the JLF plaintiffs' settlements and to order the remaining funds in the court's registry to be paid to Johnson as attorney fees.

¶ 40        On August 6, 2015, Baum filed an objection to Johnson's motion for summary judgment. Baum noted that Johnson had demanded mandatory arbitration and that Johnson participated in the arbitration process and was awarded legal fees and reimbursement of expenses. Baum asserted that Johnson claimed and received 25% of the attorney fees in the trial pick cases of Troupe and Valerius. Baum further asserted that the remaining issue was whether he was entitled to 10% of the attorney fees from the settlement of the non-trial-pick cases. Baum argued that Johnson had been paid his share of attorney fees under the fee-sharing arrangement that he was now disavowing. Baum claimed that Johnson should be estopped from denying the existence of the fee-sharing arrangement.

¶ 41                                        E. The CBF Assessment
¶ 42        While disagreements over the allocation of the global settlement funds were heating up in the St. Clair County litigation, Johnson's objection to paying the CBF assessment had gotten the attention of the Avandia PSC and the United States District Court for the Eastern District of Pennsylvania. In February 2015, the PSC asked the federal court to issue an order to show cause why the claims settled in the Gabel v. GlaxoSmithKline state court litigation should not be considered "covered claims" subject to the Avandia CBF assessment. In response to the PSC's motion, Johnson, through counsel, entered a limited appearance to contest the federal district court's jurisdiction over him and the St. Clair County litigation. Attorney Baum was called as a witness in a hearing before the federal court. Baum testified that he explained to Johnson that the Gabel cases would be subject to the CBF assessment because the trial team would need the MDL work product to prepare for and try the case. Baum further testified that he used the MDL work product to prepare for the bellwether cases in St. Clair County.

¶ 43        On July 21, 2015, Judge Cynthia M. Rufe issued an order requiring GSK to withhold 7% of the settlement funds for the CBF. *In re Avandia Marketing, Sales Practices, & Product Liability Litigation*, MDL No. 1871 (E.D. Pa., July 21, 2015). Judge Rufe found that Johnson implicitly agreed to pay the assessment by his conduct, including retaining Baum and Rosemond as trial counsel and extensively using MDL work product to advance the Gabel cases. Based upon the express agreement of Baum and Rosemond to abide by the Avandia CBF assessment and the implicit agreement by Johnson, Judge Rufe found that all settled claims in the Gabel litigation in which Baum, Rosemond, or the Johnson firm held an interest were "covered claims" and subject to the CBF assessment. See *In re Avandia Marketing*, MDL No. 1871 (E.D. Pa., July 21, 2015). Johnson appealed the ruling, and the Third Circuit Court of Appeals affirmed. *In re Avandia Marketing Sales Practices*, 658 F. App'x 29 (3d Cir. 2016). The PSC then requested an injunction to prevent the circuit court in St. Clair County from taking any action to block the payment of the CBF assessment. Judge Rufe deferred ruling on the request for injunctive relief and directed the parties to provide a copy of the court's decision to the Illinois circuit court. *In re Avandia Marketing, Sales Practices*, MDL No. 1871 (E.D. Pa., Jan. 2, 2018).

¶ 44                                    F. Final Approval

¶ 45        Meanwhile, on August 9, 2017, pursuant to Judge Rufe's order, GSK filed a motion to disburse the funds that were being held to pay the CBF assessment. On October 24, 2017, Johnson filed a motion in opposition to GSK's motion. Johnson argued that the reserved funds could not be disbursed pursuant to an order of the MDL court because the MDL court lacked personal and subject-matter jurisdiction over Johnson and the JLF plaintiffs. Johnson claimed that the circuit court was required to make an independent determination of whether Johnson and the Johnson plaintiffs owed anything to the CBF. Johnson also argued that the Avandia PSC and Baum should be prohibited from collecting any attorney fees from the JLF plaintiffs because the Illinois Rules of Professional Conduct prohibited the division of fees without written confirmation of a fee-sharing agreement by the JLF plaintiffs. Johnson further asserted that Baum's ongoing receipt of funds from the Avandia CBF amounted to improper self-dealing against the direct interests of the JLF plaintiffs.

¶ 46        On April 17, 2018, the trial court held an evidentiary hearing for purposes of resolving the issues regarding the attorney fees and the CBF assessment. After hearing testimony from Baum and Johnson, the court found that all plaintiffs had benefitted from the Avandia "trial in a box" materials, and it directed GSK to pay $735,000 into the Avandia CBF. The court further ordered that the unpaid litigation expenses, including $27,479.10 in court reporting fees and $7600 in expert fees, be paid from the funds held in the court's registry. The court awarded Baum $242,130 in attorney fees, to be paid from funds in the court's registry, and ordered that the remaining funds in the registry be paid to Johnson as attorney fees. Johnson appealed.

¶ 47                                    II. ANALYSIS

¶ 48                            A. The Fee-Sharing Arrangement

¶ 49        On appeal, Johnson initially contends that the circuit court erred in awarding Baum any attorney fees from the JLF plaintiffs' settlements. Johnson argues that Baum may not receive attorney fees because none of the JLF plaintiffs gave written approval to representation by

- 10 -

Baum or written approval to a fee-sharing arrangement between Baum and Johnson as required under Rule 1.5 of the Illinois Rules of Professional Conduct of 2010 (eff. Jan. 1, 2010).

¶ 50    Baum agrees that, under Rule 1.5 of the Illinois Rules of Professional Conduct of 2010, contingency fee agreements must be made in writing and the client must consent, in writing, to the division of fees between attorneys of different firms. Ill. R. Prof'l Conduct (2010) R. 1.5 (eff. Jan. 1, 2010). Baum contends that it was Johnson who failed to notify the JLF plaintiffs that Baum had been engaged as cocounsel in their cases and that it was Johnson who failed to obtain the plaintiffs' written consent to the fee-sharing arrangement with Baum. Baum asserts that under these types of circumstances, where there has not been strict compliance with the rules concerning disclosure of fee-sharing, the appropriate remedy is not to give a windfall to Johnson at the expense of less culpable cocounsel but rather to permit the fee split under joint venture and fiduciary duty principles.

¶ 51    The Illinois Rules of Professional Conduct of 2010 provide a comprehensive set of rules governing the professional conduct of Illinois attorneys. The Rules of Professional Conduct of 2010 are part of the Illinois Supreme Court rules, and so they operate with the force and effect of law. *In re Vrdolyak*, 137 Ill. 2d 407, 422 (1990). The supreme court rules are not aspirational or mere suggestions; they have the force and effect of law. *Bright v. Dicke*, 166 Ill. 2d 204, 210 (1995). Additionally, the Illinois Rules of Professional Conduct of 2010 are interpreted in accordance with the principles of statutory construction. *Ferris, Thompson & Zweig, Ltd. v. Esposito*, 2017 IL 121297, ¶¶ 21-22.

¶ 52    Prior to 1980, Illinois prohibited the sharing of fees by lawyers who were not in the same firm where the only service provided by a lawyer was the referral of a client to the receiving lawyer. *Esposito*, 2017 IL 121297, ¶ 26. With the adoption of the Illinois Code of Professional Responsibility (Ill. S. Ct. Code of Prof'l Res. R. 1-101 *et seq.* (eff. July 1, 1980)) in 1980, fee-sharing agreements that were based upon client referrals were permitted, provided they satisfied significant safeguards designed to protect the client. *Esposito*, 2017 IL 121297, ¶ 26.

¶ 53    Rule 1.5 of the Illinois Rules of Professional Conduct of 2010[4] currently governs attorney-fee agreements. Ill. R. Prof'l Conduct (2010) R. 1.5 (eff. Jan. 1, 2010). The provisions of Rule 1.5 embody Illinois's public policy of placing the rights of clients above any remedies of lawyers seeking to enforce fee-sharing arrangements. *Romanek v. Connelly*, 324 Ill. App. 3d 393, 399 (2001). Accordingly, a fee-sharing agreement that violates the provisions of Rule 1.5 is against public policy and unenforceable. See *Thompson v. Hiter*, 356 Ill. App. 3d 574, 589-90 (2005).

¶ 54    Rule 1.5(e) provides that a "division of a fee between lawyers who are not in the same firm may be made only if:

    (1) the division is in proportion to the services performed by each lawyer, or if the primary service performed by one lawyer is the referral of the client to another lawyer and each lawyer assumes joint financial responsibility for the representation;

---

[4]On February 8, 1990, the Illinois Supreme Court repealed the Illinois Code of Professional Responsibility and adopted the Illinois Rules of Professional Conduct (eff. Aug. 1, 1990). Subsequently, the supreme court adopted the Illinois Rules of Professional Conduct of 2010 (eff. Jan. 1, 2010) and repealed the prior Rules of Professional Conduct. See Ill. S. Ct., M.R. 3140 (eff. July 1, 2009).

(2) the client agrees to the arrangement, including the share each lawyer will receive, and the agreement is confirmed in writing; and

(3) the total fee is reasonable." Ill. R. Prof'l Conduct (2010) R. 1.5(e) (eff. Jan. 1, 2010).

¶ 55 Rule 1.5(e) sets out specific conditions that must be satisfied for a fee-sharing agreement to be enforced. *Esposito*, 2017 IL 121297, ¶ 35. Our supreme court has described these conditions as being "in the nature of a checklist" in which "each *** item[ ] must be crossed off before moving to the next" and "all must be checked off before the fees may be divided." *Esposito*, 2017 IL 121297, ¶ 35. Initially, the division of fees must be in proportion to the services performed by each lawyer, or where the primary service performed by one lawyer is the referral of the client to another lawyer, both lawyers must assume joint financial responsibility for the representation. Ill. R. Prof'l Conduct (2010) R. 1.5(e)(1) (eff. Jan. 1, 2010); *Esposito*, 2017 IL 121297, ¶ 35. Next, the client must agree, in writing, to the referral of the case and the fee-sharing arrangement between the referring lawyer and the receiving lawyer, including how much each lawyer will receive. Ill. R. Prof'l Conduct (2010) R. 1.5(e)(2) (eff. Jan. 1, 2010); *Esposito*, 2017 IL 121297, ¶¶ 34-35. Finally, the total fees charged to the client must be reasonable, as assessed pursuant to the factors set forth in Rule 1.5(a) of the Illinois Rules of Professional Conduct of 2010. Ill. R. Prof'l Conduct (2010) R. 1.5(e)(3) (eff. Jan. 1, 2010); *Esposito*, 2017 IL 121297, ¶¶ 32, 35.

¶ 56 In this case, there was evidence that Baum and Johnson agreed to a fee-sharing arrangement with regard to Johnson's Avandia cases. According to the e-mail exchange between Baum and Johnson in June 2012, Baum and Johnson agreed that Baum and his team would prepare the bellwether cases for trial, while Johnson's team would make court appearances and work on the non-trial-pick cases. According to the e-mail exchange, Baum was to receive 75%, and Johnson was to receive 25% of the amounts obtained by settlement or verdict in the bellwether cases. Baum was to receive 10%, and Johnson was to receive 90% of any award obtained on behalf of JLF plaintiffs in the nontrial cases. However, as Baum and Johnson have conceded, none of the JLF plaintiffs, other than perhaps bellwether plaintiffs Troupe and Valerius, were informed of and consented in writing to the representation by Baum and to the fee-sharing arrangement between Baum and Johnson. Thus, pursuant to Rule 1.5 of the Illinois Rules of Professional Conduct of 2010, the fee-sharing agreement between Baum and Johnson is unenforceable as against public policy.

¶ 57 Baum argues on appeal that he and Johnson undertook a joint venture[5] giving rise to fiduciary duties on the part of Johnson and that Johnson breached his fiduciary duties. Baum asserts that under the circumstances presented here, where there has not been strict compliance with the rules concerning disclosure of fee sharing, the appropriate remedy is not to give a windfall to Johnson but rather to permit a sharing of fees based on a joint venture.

¶ 58 Upon reviewing of the record, we find no indication that Baum raised the theory of a joint venture before the trial court. Baum's claim for attorney fees was premised on the existence of a fee-sharing agreement. However, even if we presume Baum and Johnson were carrying on as coventurers, both attorneys remained subject to the requirements of Rule 1.5(e) of the Illinois Rules of Professional Conduct of 2010. The provision of Rule 1.5(e) requiring a client's

---

[5]A joint venture is an association of two or more persons to carry out a single enterprise for profit. *In re Johnson*, 133 Ill. 2d 516, 526 (1989).

written consent to fee sharing between counsel of different firms applies regardless of the theory of recovery asserted. See *Hiter*, 356 Ill. App. 3d at 589-90; *Hofreiter v. Leigh*, 124 Ill. App. 3d 1052, 1055 (1984). A fee-sharing agreement cannot be enforced absent client consent whether the referring attorney seeks to recover his share of fees under a contract theory or a breach of fiduciary duty theory arising from a joint venture. *Naughton v. Pfaff*, 2016 IL App (2d) 150360, ¶ 64.

¶ 59    Finally, we need not consider Baum's argument that, under the circumstances of this case, the appropriate remedy is to uphold the fee-sharing arrangement based on substantial compliance with the fee-sharing rule. In this case, the record demonstrates there was no attempt to comply with the requirements of Rule 1.5 of the Rules of Professional Conduct of 2010. Baum and Johnson have acknowledged that neither attempted to notify the JLF plaintiffs of their fee-sharing arrangement as required by Rule 1.5(e). Rule 1.5 is a supreme court rule. As noted earlier, supreme court rules are orders of the court. See *Bright*, 166 Ill. 2d at 210. They are neither aspirational nor mere suggestions; they have the force of law, and there is a presumption that they will be obeyed and enforced as written. *Bright*, 166 Ill. 2d at 210; *In re Vrdolyak*, 137 Ill. 2d at 422. The fee-sharing arrangement between Johnson and Baum was not disclosed to, and approved in writing by, the JLF plaintiffs. The failure to comply with Rule 1.5(e) precludes enforcement of the fee-sharing arrangement. *Hiter*, 356 Ill. App. 3d at 590; *Schniederjon v. Krupa*, 162 Ill. App. 3d 192, 195 (1987) (courts will not enforce an agreement that is against public policy, no matter "whose ox is gored").

¶ 60    Baum and Johnson are seasoned attorneys. Each had an obligation to ensure that the JLF plaintiffs were fully informed of Baum's representation and the fee-sharing arrangements between Baum and Johnson. Each had an obligation to ensure the JLF plaintiffs consented, in writing, to the shared representation and the shared fee arrangement. Neither attorney provided this information to the JLF plaintiffs. Therefore, we find that the fee-sharing arrangement between Baum and Johnson violated the public policy of Illinois and is unenforceable. Accordingly, the order awarding Baum $242,130 as attorney fees in the nontrial cases is hereby vacated, and those fees revert to Johnson. In entering this order, we are not excusing Johnson's inaction. We are simply upholding the public policy to protect the interests of the clients above the remedies of the attorneys.

¶ 61                              B. The Avandia Common Benefit Fund

¶ 62    Next, we consider whether the trial court erred in requiring Johnson and the JLF plaintiffs to pay $735,000 to the Avandia CBF as an expense of litigation. Johnson readily acknowledges that his representation agreement with each of the JLF plaintiffs provides that the client shall pay out of the client's share of the recovery all court costs and expenses in connection with the litigation. Johnson asserts that his basic representation agreement refers to any potential costs that may arise in a mass action case. Johnson contends that he never signed an agreement to pay the Avandia CBF assessment and that therefore the Avandia MDL court had no jurisdiction over him or his clients' settlement. Johnson argues that the MDL order is not binding on a state court in Illinois and cannot serve as a basis for requiring an allocation of the settlement to the CBF.

¶ 63    In this case, the trial court directed GSK to hold $735,000 in trust pending a hearing on the issue of whether that sum would be paid to the Avandia CBF. During a hearing on April 18, 2018, the court heard sworn testimony from Baum and Johnson. Baum testified that he notified

Johnson of the obligation to pay the CBF assessment. He produced two e-mail exchanges, which were marked as exhibits and read into the record. The first e-mail, dated March 11, 2012, was sent from Johnson to Bob Jones and Dave Jones, and Michael Baum and others were "cc'd" on the e-mail. Johnson wrote that "the defendants are not willing to settle our Avandia cases and therefore we are going to trial." Johnson noted that we have "three additional lawyers who are going to work on these cases with us. *** We have available a complete trial package, including pre-marked exhibits and video, deposition cuts, et cetera." Baum further testified that the e-mail was significant because it showed there was not enough time between March and the first bellwether trial setting to prepare the case without using the "trial in a box" materials and resources. Baum indicated that he and his team used the "trial in box" to prepare the bellwether cases for trial. Baum produced a second e-mail from Johnson to GSK attorneys dated July 11, 2012. In this e-mail, Johnson advised GSK counsel that it would take substantially more in settlement money due to the increase in expenses, additional counsel, "CBF," and trial preparation.

¶ 64    Johnson's representation agreement was also offered into evidence. The agreement is titled "Attorney Representation Agreement—Avandia." Paragraph 4 of the agreement states, in pertinent part:

> "4. After the above fees are deducted, client shall pay to attorneys, ONLY OUT OF THE CLIENT'S SHARE OF THE RECOVERY AND NOT OUT OF CLIENT'S POCKET, all court costs and expenses, advanced by the attorneys or in connection with said matter. Costs shall include any 'MDL Assessment or Fee,' 'common benefit fee' or any other fee or cost imposed by any court or withheld from any settlement or judgment. The attorneys are authorized to incur those expenses they deem reasonable and necessary to accomplish a satisfactory resolution of the claim and shall advance those expenses as incurred. The costs of these services not to exceed the customary and reasonable charges for such services in the geographic location they are provided."

¶ 65    During the hearing, Johnson conceded that his representation agreements included a clause providing that litigation costs included any "MDL assessment or Fees" and "common benefit fees." Johnson testified that the client representation agreements were written prior to any pretrial orders by the Avandia MDL court and that his firm's representation agreements all contain a general clause identifying the types of expenses that a client may be obligated to pay, should those expenses be incurred. Johnson further testified that he did not sign an agreement or otherwise consent to be taxed for using the Avandia "trial in a box" materials. Johnson acknowledged that Baum used the "trial in a box" materials and resources to prepare the bellwether cases for trial.

¶ 66    After hearing from Baum and Johnson, the trial court concluded that the issue was straightforward. The trial court respectfully acknowledged Judge Rufe's orders in the Avandia MDL litigation. The trial court also determined it had jurisdiction over the settlement fund and that the issue under consideration was whether the information in the "trial in a box" benefitted the plaintiffs.

> "I'm looking at that as costs assessed. It's pretty straightforward to the Court. At this point, I'm wondering what we've been doing all this time because it's pretty ultimately my only decision is whether they utilized the trial in a box that was provided by the plaintiff's steering committee. If they did, the money gets released to the common benefit fund and if they didn't then I guess the $400,000 gets resolved in whatever way

the attorneys fees are to be assessed and that other 3 gets distributed amongst the plaintiffs, right?

\* \* \*

So really the only issue I have before me right now is whether these plaintiffs benefitted in such that they need to kick into the you know, into the kitty for the common benefit that they derived, right?"

¶ 67    After considering the evidence, the court found that the "trial in a box" materials and resources were used and contributed to benefit all plaintiffs. The court's finding is supported by substantial evidence in the record. The evidence demonstrated that Johnson's representation agreement apprised the JLF plaintiffs of the potential Avandia CBF expenses. In signing the agreements, the JLF plaintiffs gave Johnson authority to bind them to pay reasonable expenses of litigation. Baum testified that the "trial in a box" materials were required in order to prepare for the trial of the bellwether cases. The "trial in a box" materials included indexed depositions, documents, and expert materials ordinarily used during a trial. There was no challenge to the value of these materials and resources to the JLF plaintiffs' cases, and there was no claim that the cost of the "trial in a box" was unreasonable or unnecessary to the litigation.

¶ 68    Johnson also argued that the trial court erred in ordering payment of the CBF assessment because Baum's involvement with the Avandia MDL presented a conflict of interest with the JLF clients. Johnson claimed that, while Baum was representing the JLF plaintiffs, he was simultaneously supporting the Avandia PSC's attempts to require the JLF plaintiffs to pay the Avandia CBF assessment and receiving undisclosed fees or compensation from the Avandia CBF. Johnson claimed that Baum's activities constituted improper self-dealing in violation of Rule 1.7 and Rule 1.8 of the Illinois Rules of Professional Responsibility of 2010, arguing that the sums paid into the CBF would inure to the direct benefit Baum.

¶ 69    At the outset we note that, in this litigation, Johnson filed more than a few motions alleging that Baum has violated our rules of professional conduct. Those types of allegations are serious, yet Johnson never pressed the trial court for a hearing to present the allegations for a ruling. At one point in the litigation, Johnson filed an emergency motion to disqualify Baum but then failed to call it up for a hearing, thereby abandoning the motion. We remind advocates that allegations of professional misconduct are not to be invoked as "procedural weapons." Ill. R. Prof'l Conduct (2010), Preamble (eff. Jan. 1, 2010). Further, although often overlooked by attorneys in the midst of contentious litigation, Rule 8.4(g) of the Illinois Rules of Professional Conduct of 2010 clearly states that it is professional misconduct for a lawyer to use or threaten to use professional disciplinary claims "to obtain an advantage in a civil matter." Ill. R. Prof'l Conduct (2010) R. 8.4(g) (eff. Jan. 1, 2010). Moreover, there is a long line of precedent in Illinois that requires an attorney who is aware of a violation of the rules of professional responsibility has an affirmative obligation to report the misconduct to the proper disciplinary authority. See *In re Himmel*, 125 Ill. 2d 531, 539 (1988).

¶ 70    In the proceedings below, Johnson presented little factual support for his allegations of improper self-dealing. Baum's interests were aligned with the JLF plaintiffs. Baum also testified in the federal court action as a witness in the show-cause proceeding. During the hearing before the St. Clair County circuit court, Baum acknowledged that he received some compensation from the work he had done in the past for the Avandia MDL. Baum indicated that his work on the St. Clair County cases would not be considered part of the work for the "common benefit fund" because the majority of the MDL cases had been settled by the time

Baum represented the JLF plaintiffs. Baum testified that he received no payment from the MDL for any of the work on the St. Clair County cases, nor did he anticipate a payment. As noted above, Johnson's clients had consented to "MDL" and "common benefit fund" fees or assessments. Presumably, Johnson explained the purpose of such fees and assessments when he had his clients execute the contingency fee agreements. The trial court considered the evidence and found that Baum's testimony was credible. The trial court further found that the CBF assessment was for the payment of work product materials and was a reasonable expense of the state court litigation. After reviewing the record, we do not find that the trial court erred in requiring Johnson and the JLF plaintiffs to pay $735,000 to the Avandia CBF as an expense of litigation.

¶ 71                                   C. Reduction in Johnson's Attorney Fees

¶ 72        Johnson next claims that the trial court erred when it included the settlements of bellwether plaintiffs, David Troupe and Labranche Valerius, and non-trial-pick plaintiffs, Dinges and Merlino, as part of the $10.5 million settlement fund. Johnson characterized the court's order as a "cram-down" order in which the court reduced Johnson's 40% contingent fee to fund the settlements of plaintiffs whom he did not represent. Johnson argues that the court essentially rewrote his attorney fee contract, reducing his contingent fee, thereby requiring him to fund the settlements of Troupe, Valerius, Dinges, and Merlino from his share of attorney fees. Johnson asks this court to set aside the order deducting these settlements from his attorney fees and order GSK to reimburse Johnson $1,065,000 for his lost attorney fees.

¶ 73        It has long been held that contingency contracts are always subject to the supervision and scrutiny of the court as to reasonableness. *Pocius v. Halvorsen*, 30 Ill. 2d 73, 83 (1963). The trial court has broad discretion when it comes to assessing the reasonableness of contingency fees. See generally Ill. R. Prof'l Conduct (2010) R. 1.5 (eff. Jan. 1, 2010); *In re Doyle*, 144 Ill. 2d 451, 463 (1991). The trial court exercises its supervisory authority over contingency fee agreements by considering all the circumstances of the case to determine whether the contingency fee amount is just and reasonable. *Doyle*, 144 Ill. 2d at 463. The burden is on the attorney to prove the reasonableness of the fees. *In re Estate of Sass*, 246 Ill. App. 3d 610, 615-16 (1993).

¶ 74        This case involved an aggregated settlement of 202 individual cases. The parties, including Johnson, invoked the jurisdiction of the court to ensure the fairness and enforceability of the settlement agreement. During the hearing on January 27, 2015, following an in-chambers conference, the trial court entered an order setting out the allocations of the $10.5 million settlement fund. The court found that the allocations were in the best interests of all plaintiffs and that the settlement agreement was fair to all parties and to counsel. Prior to the proceedings in open court, the court and the attorneys had discussions about the allocations in the order. Apparently, there were discussions regarding the reduction of attorney fees for all of plaintiffs' attorneys, including Johnson, David Jones, Robert Jones, and Joseph Bartholomew. There is no transcript of these discussions, and no bystanders' report has been submitted. Attorney Bartholomew noted that Johnson had some objection to the order before the court, but the objection was not disclosed. None of plaintiffs' attorneys, nor any of the other attorneys of record, requested that the trial court set forth on the record the court's findings and reasoning regarding the allocation of the attorney fees. In the absence of a sufficiently complete record to support Johnson's claim of error on appeal, this court will presume that there was an

adequate factual basis for the trial court's decision and that the decision was in conformity with the law. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). Accordingly, we cannot say that the trial court's allocation of attorney fees was an abuse of discretion.

¶ 75 In addition, it is clear that, pursuant to the settlement agreement between GSK and Johnson, GSK tendered $10.5 million into the settlement fund and GSK had no responsibilities regarding the allocation of those funds once they were tendered. Johnson and the JLF plaintiffs accepted the settlement funds. The record indicates that each of the settling JLF plaintiffs agreed to accept an allocation of the settlement fund and that each JLF plaintiff was paid pursuant to the assigned allocation. Pursuant to a joint stipulation by GSK and Johnson and the JLF plaintiffs, the trial court dismissed, with prejudice, all claims against GSK. Neither Johnson nor the JLF plaintiffs filed any motion to set aside the order of dismissal. Any further claims against GSK are barred by the terms of the release and the order of dismissal. Given these facts and circumstances, there is frankly no effectual relief that can be granted.

¶ 76                                    III. CONCLUSION

¶ 77 In summary, we find that the fee-sharing arrangement between Baum and Johnson did not comply with the requirements of Rule 1.5 of the Rules of Professional Conduct of 2010. Therefore, the fee-sharing arrangement violated the public policy of Illinois and is unenforceable. Accordingly, that portion of the order awarding $242,130 to Baum as his share of the attorney fees in the non-trial-pick cases is hereby vacated, and those fees revert to Johnson. Additionally, the order directing payment of $35,079.10 in litigation expenses is affirmed, and those expenses shall be paid as per the order of the trial court. The order requiring the payment of $735,000 to the Avandia common benefit fund as an expense of ligation was not an abuse of discretion where Johnson and the JLF plaintiffs benefitted from the use of the MDL work product materials, and that shall be paid as per the order of the trial court. Johnson failed to show that the trial court's decision to reduce his contingency fee was an abuse of discretion. In all other respects, the judgment of the circuit court is affirmed. Accordingly, the judgment of the circuit court is affirmed in part and reversed in part.

¶ 78 Affirmed in part and reversed in part.

¶ 79 Cause remanded.