# Illinois Official Reports

## Appellate Court

---

<div style="border:1px solid">

### *Camelot, Inc. v. Burke Burns & Pinelli, Ltd.*, 2021 IL App (2d) 200208

</div>

---

| | |
|---|---|
| Appellate Court Caption | CAMELOT, INC.; TAEK KIM, M.D.; YOUK LEE, M.D.; and SANG IK KIM, M.D., Plaintiffs-Appellees, v. BURKE BURNS & PINELLI, LTD., Defendant-Appellant. |
| District & No. | Second District<br>No. 2-20-0208 |
| Filed | May 20, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 15-CH-1161; the Hon. Bonnie M. Wheaton, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Edward J. Burke, Vincent D. Pinelli, and Christopher J. Hales, of Burke Burns & Pinelli, Ltd., of Chicago, for appellant.<br><br>Patrick J. Williams and Tracy L. Stanker, of Ekl, Williams & Provenzale LLC, of Lisle, for appellees. |
| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion. Presiding Justice Bridges and Justice Birkett concurred in the judgment and opinion. |

**OPINION**

¶ 1        Defendant law firm, Burke Burns & Pinelli, Ltd. (the firm), appeals an order of the circuit court of Du Page County granting a declaratory judgment in favor of plaintiffs, Camelot, Inc. (Camelot), Taek Kim, M.D., Youk Lee, M.D., and Sang Ik Kim, M.D. (Ik Kim) (the clients),[1] in this dispute concerning legal fees arising out of the firm's representation of the clients in an underlying lawsuit. We affirm.

¶ 2                                    I. BACKGROUND
¶ 3                         A. The Underlying Shareholder Litigation
¶ 4        The following pertinent facts are taken from pleadings and trial exhibits in the record.

¶ 5                         1. *The Clients' Involvement With Camelot*
¶ 6        Beginning in the 1970s, and continuing into the 1990s, attorney Robert Wayt, and then Wayt and his partner, Patricia deRosset, provided legal and financial services to the clients, who were, among other things, seeking tax shelters. Relying on the advice of Wayt and deRosset, the clients became partners in a horse breeding and boarding operation in Du Page County called Fairlane Farms. Again, relying on the advice of Wayt and deRosset, the clients incorporated Fairlane Farms into Camelot, which owned approximately 20 acres of land (the property) and continued the horse breeding and boarding operation.

¶ 7        According to the clients' fourth amended complaint in the underlying shareholder litigation, the other shareholders in Camelot were Wayt, deRosset, Denes Martonffy, and Luis Yarzagaray.[2] The clients ran their respective medical practices while leaving the operation of Camelot to Wayt and deRosset. A dispute arose when Wayt, deRosset, Martonffy, and Yarzagaray allegedly stole Camelot's assets.

¶ 8                              2. *The Clients Hire the Firm*
¶ 9        The firm and the clients entered into three retainer agreements related to the shareholder litigation. The first agreement, dated June 20, 1996, provided that Taek Kim and Youk Lee would pay (1) a nonrefundable $30,000 retainer, against which the firm would bill $200 per hour, (2) 20% of "any recovery by settlement or judgment excluding the sum of $650,000, which represents the combined value of the Camelot shares of stock currently in the names of [their] spouses," and (3) costs. That agreement also provided for a cap on attorney fees of $75,000, "exclusive of the 20% recovery."

¶ 10       The second retainer agreement was with Ik Kim, but it was replaced with the third agreement, also with Ik Kim, dated March 23, 2004. This third agreement provided that Ik Kim would pay the firm (1) 20% of "any recovery by settlement or judgment excluding the sum of $325,000, which represents the agreed upon value of the Camelot shares of stock currently in the name of [Ik] Kim," and (2) costs.

_____

[1]When we refer to "clients," we mean the individuals only. When we refer to "plaintiffs," we mean the individuals and Camelot.

[2]At the trial of the present matter, Taek Kim testified that there were only six shareholders in Camelot.

- 2 -

¶ 11                    3. *The Settlement of the Shareholder Litigation*

¶ 12       On October 19, 2004, the clients entered into a written settlement agreement (shareholder settlement) disposing of the shareholder litigation. In pertinent part, the shareholder settlement resulted in the clients owning 100% of Camelot's stock and Camelot obtaining fee simple title to the property, free of liens and encumbrances. In addition, according to the terms of the shareholder settlement, plaintiffs paid a combined $596,032 to deRosset for her shares in Camelot, her corporate resignation, and the delivery of all corporate records in her possession. Plaintiffs also paid $25,000 to Martonffy for his shares in Camelot.

¶ 13               B. The Fee Dispute Between the Firm and the Clients

¶ 14       On October 21, 2004, the firm sent the clients a "Final Settlement Statement" (fee statement) seeking $1,037,262 in attorney fees. The document listed the "gross settlement recovery" as "20.2348 acres @ $325,000," for a total of $6,576,310. The fee statement then subtracted from the gross total the following amounts: $390,000 (credit for "corporate cash infusion to enable deRosset stock redemption settlement"), $25,000 (credit for "corporation cash infusion to enable Martonffy cash settlement"), $325,000 ("Taek Kim's cash exclusion"), $325,000 ("Youk Lee's cash exclusion"), and $325,000 ("Ik Kim's cash exclusion"). From the net settlement recovery of $5,186,310, the firm deducted 20%, or $1,037,262, as its fee.

¶ 15       Edward J. Burke, the firm's partner who was primarily responsible for the shareholder litigation, calculated the total gross recovery of $6,576,310 as being the value of the property on October 19, 2004, the date the parties settled the shareholder litigation. Burke arrived at that value using an appraisal done in August 1999 as part of the shareholder litigation and certain alleged comparable sales.

¶ 16       The clients never signed the fee statement. Then, on September 27, 2005, the parties (including Camelot) entered into an "addendum" to the retainer agreements. In that addendum, the firm (1) acknowledged payment of $300,000 toward the "outstanding attorneys fees due this firm," (2) recited that, if the property was not sold and closed on by October 15, 2005, plaintiffs would pay an additional $100,000 toward the "outstanding attorneys fees due the firm," and (3) provided that the "remaining balance of attorneys fees due and owing this firm" were to be paid on the closing date of the sale of the property. The clients paid the additional $100,000 when the property had not sold by October 15, 2005. The record shows that the clients placed the property on the market with no success. Although they obtained a buyer at a purchase price of approximately $6 million, that sale did not materialize.

¶ 17       On February 9, 2011, Burke sent clients a letter (20% demand) stating: "As you know consistent with our fee agreements (copies of which I enclose herewith) this firm is entitled to 20% of the sale price of the Camelot property less certain offsets. Please advise me immediately as to the payment of said fees to this firm." Taek Kim did not respond. However, in March 2011, Taek Kim wrote to Burke explaining why the clients disagreed with the fee statement. Taek Kim set forth three reasons: (1) the agreement was for 20% of the recovery in the shareholder litigation, there was never a set dollar amount agreed to, and the presumption was that the 20% would be paid when the property was sold; (2) the clients paid $400,000 upon request even though the property had not sold; and (3) the remainder of the fee cannot be known until the property is sold.

¶ 18       From April through July 2013, the firm sent the clients "reminder notices" that the balance of the fee immediately due was $637,262. In October and November 2013, the firm sent

identical reminder notices. Then, on December 5, 2013, Burke sent another 20% demand to the clients. On December 18, 2013, the firm sent the clients another reminder notice that $637,262 was due immediately.

¶ 19    In October 2014, when the firm learned that the clients mortgaged the property, the firm recorded an attorney's lien against the property in the amount of $637,262. On November 21, 2014, Burke sent the clients a letter advising them that the firm had placed the lien and was billing them $637,262. From January to July 15, 2014, the firm again sent the clients reminder notices that they owed $637,262. Then, on July 17, 2014, Burke sent the clients another 20% demand. In August 2014, the firm resumed sending the clients monthly reminder notices that the fee immediately owed was $637,262. It is undisputed that the clients have not paid the fee.

¶ 20                                    C. The Present Litigation

¶ 21    On June 24, 2015, plaintiffs sued the firm. They filed an amended complaint (1) to quiet title to the property, (2) for a declaratory judgment as to the amount of attorney fees owed, and (3) for an accounting. The trial court granted plaintiffs summary judgment on the quiet title count and ordered the firm to release its lien. This court affirmed that judgment in *Camelot, Inc. v. Burke Burns & Pinelli*, 2017 IL App (2d) 170038-U, ¶ 36 (*Camelot I*). On December 17, 2019, the parties proceeded to a bench trial on the remaining counts of the amended complaint. Burke and Taek Kim were the only witnesses who testified. Both witnesses testified, *without objection*, to parol evidence surrounding the making of the retainer agreements and the addendum.

¶ 22                                    1. *Edward J. Burke*

¶ 23    Burke testified that he usually dealt with Taek Kim, who acted as the "point person" for the clients. In Burke's view, when the shareholder dispute arose, the clients collectively owned 50% of Camelot's stock. According to Burke, as a result of the shareholder settlement, the clients obtained 100% of Camelot's stock, and Camelot gained title to the property. Burke testified that the $390,000 cash payment to deRosset and the $25,000 cash payment to Martonffy for their shares of stock, as reflected on the fee statement, were part of the shareholder settlement. Burke testified that the clients agreed to the firm's fee of $1,037,262, although he acknowledged that they never paid it.

¶ 24    Regarding Taek Kim and Youk Lee's retainer agreement, Burke testified that the $650,000 exclusion from the 20% attorney fee was an arbitrary number proposed by the two doctors, to which the firm agreed, that reflected moneys that Taek Kim and Youk Lee had already invested in Camelot or had paid in prior legal fees. According to Burke, the same was true of the $325,000 exclusion from the 20% fee in Ik Kim's retainer agreement.

¶ 25    Burke testified that he did not discuss with the clients his valuation of the property for purposes of calculating the firm's 20% fee before he sent them the fee statement. Instead, Burke testified, he had discussions, both orally and in writing, with the clients during 2005. Specifically, according to Burke, in March 2005, Taek Kim related that he was willing to sell the property for $8 million to a buyer named Leonitios and pay the firm $1.1 million in fees. In June 2005, the clients were willing to sell the property for $6.5 million and then later for $6.2 million. According to Burke, the clients, in correspondence during this period, agreed to

pay the firm $1,037,262.[3] Burke acknowledged that his letters to the clients in April 2005, July 2005, and September 2005 referenced his original October 2004 transmission of the firm fee statement but that it never mentioned that the clients had agreed to pay that sum. Burke also acknowledged that the firm did not sue the clients for the fee. He explained that the firm chose not to sue because it was doing Camelot's corporate work and Burke also represented the clients individually.

¶ 26 Burke testified that the addendum evidenced a partial payment toward the fee of $1,037,262, although that figure was not specifically included in the document. Burke agreed that the addendum deferred the balance of the fee until the sale of the property. According to Burke, he had an in-person meeting with Taek Kim sometime between July 17 and September 27, 2005. During that meeting, Taek Kim said that he did not want further litigation and agreed that the firm was entitled to a fee of $1,037,262. According to Burke, that conversation, along with the clients' willingness to accept offers in the $6 million range for the sale of property, convinced the firm to accept two partial payments and defer the balance until the property sold. Burke testified that the parties understood that the sale should take place within six months to a year. However, the property had not sold by the time of trial.

¶ 27 Burke acknowledged that Taek Kim stated in writing that the agreement was for a fee equal to 20% of the value of the property when it sold and that the clients had never agreed to pay a specific dollar amount. Burke testified that, although he considered this position to be "bizarre," he did not reply to it or indicate to Taek Kim that the clients had previously agreed to pay $1,037,262.

¶ 28 Burke testified that he valued the property using an appraisal that was done five years previously during the shareholder litigation. Burke also used certain comparable sales in arriving at his valuation of the property.[4]

¶ 29                                         *2. Taek Kim*

¶ 30 Taek Kim testified that the $650,000 exclusion from the 20% fee was an arbitrary number chosen by Burke to represent the value of Taek Kim and Youk Lee's existing ownership in Camelot. Taek Kim testified that he, Youk Lee, and Ik Kim together owned 50% of Camelot's stock at the inception of the shareholder litigation.

¶ 31 According to Taek Kim, he had no discussions with Burke about the firm's fees until the execution of the addendum. Taek Kim did not recall whether he met with Burke between July and September 2005, but he denied telling Burke that he did not want further litigation. He also denied telling Burke that he agreed to pay $1,037,262 as a fee.

¶ 32 According to Taek Kim, the addendum came about after Burke told him that the firm needed cash. According to Taek Kim, plaintiffs paid $300,000 and then another $100,000, but he and Burke had no discussion about paying the remaining $637,000. Taek Kim testified that the property currently was listed for $3.5 million.

---

[3]The firm did not introduce such correspondence as exhibits.

[4]According to the exhibits in evidence, there were three "comparable sales," all of which consisted of sales of single-family residences that closed in 2002. The fourth amended complaint in the shareholder litigation indicated that the property consisted of a "horse breeding and boarding business."

¶ 33    Taek Kim testified that the clients never agreed to the fee statement because (1) they did not know what the gross settlement recovery was and they did not agree to the $6,576,310 valuation that Burke assigned to it, (2) they owed an additional $206,000 to deRosset[5] as part of the shareholder settlement that was not accounted for on the fee statement, and (3) the $325,000 cash exclusions represented the value that Burke assigned to one acre of the property for purposes of calculating his fee, whereas that figure undervalued the clients' 50% interest in the property. Using a demonstrative exhibit, Taek Kim testified that, even using Burke's calculation, the clients had overpaid the firm.

¶ 34    On cross-examination, Taek Kim testified that, even though he did not propose the $650,000 exclusion from the 20% fee, he signed the retainer agreement and initialed the $650,000 exclusion. According to Taek Kim, after Burke called him asking for cash, the clients agreed to pay $400,000. Taek Kim testified that he knew that the firm was owed a fee and that he believed that the total fee would be about $500,000, based upon the listing price of the property. Taek Kim acknowledged receiving billing reminder notices from the firm to which he never responded.

¶ 35                                   3. *The Court's Ruling*

¶ 36    The court found that, although Burke acted in good faith, the value of the property in 2004 was not $6,575,310 for purposes of determining the 20% fee because that figure was based on an appraisal that was done in 1999. The court found that the clients' "actual recovery" in the shareholder settlement "is an unknown number." The court found that the clients' interest in Camelot prior to the shareholder settlement was 50%. The court found that, because the property's value could not be determined, the value of the clients' 50% share could also not be determined.

¶ 37    Consequently, the court ruled that the firm's fee cannot be determined until the property is sold. The court also ruled that, upon that event, the clients are entitled to a credit for their 50% share of Camelot. The court further ruled that the clients are entitled to a credit for the amounts paid to deRosset and Martonffy. On February 13, 2020, the court entered a written judgment order, as follows: (1) any amounts owed to the firm or the clients cannot be determined until the sale and closing of the property, (2) upon the sale and closing of the property, the clients shall be credited for one-half of the sale price, representing their one-half interest in Camelot, (3) the clients shall be credited $415,000, representing the settlement paid to deRosset and Martonffy and $206,000, representing the settlement that plaintiffs paid to deRosset, and (4) after the firm's fee is calculated according to the foregoing formula, the clients shall receive a further credit of $400,000, representing payments that they already made toward the final fee. The court provided that its order was "final and appealable."

¶ 38    The firm filed a timely notice of appeal.

¶ 39                                      II. ANALYSIS

¶ 40    Preliminarily, we must address plaintiffs' motion to strike the firm's brief and dismiss this appeal for violations of Illinois Supreme Court Rule 341 (eff. Oct. 1, 2020). This is plaintiffs' second attempt to dismiss this appeal for the same alleged deficiencies. We denied the first

---

[5]The exact amount, according to the shareholder settlement, was $206,032. This was money in Camelot's checking account, which plaintiffs agreed to pay to deRosset.

motion and allowed the firm to file a corrected brief. Plaintiffs argue that the firm's statement of facts remains objectionable. Rule 341(h)(6) provides that the appellant's statement of facts shall contain "the facts necessary to an understanding of the case stated accurately and fairly without argument or comment." Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020). Plaintiffs maintain that the firm's statement of facts presents only those facts favorable to its position and is argumentative. Plaintiffs' argument has merit. Nowhere in the firm's statement of facts does it make clear that two witnesses testified at trial, much less set forth Taek Kim's testimony in its entirety. At oral argument, the firm stated that the facts consisted of undisputed documents. That plainly is not the case, as Burke and Taek Kim furnished differing interpretations of those documents and why they were created.

¶ 41    Indeed, the statement of facts reads like the firm's closing argument. We have the authority to strike a statement of facts that hinders our review. *Ittersagan v. Advocate Health & Hospitals Corp.*, 2020 IL App (1st) 190778, ¶ 6. We may also dismiss an appeal for failure to provide a complete statement of facts. *Ittersagan*, 2020 IL App (1st) 190778, ¶ 6. Nevertheless, we decline to strike the statement of facts. This was a two-witness trial, and the record is not complex. Plaintiffs have provided an adequate statement of facts in the appellees' brief, so our review is not hindered by the firm's brief's manifest deficiencies. However, we admonish counsel for the firm that supreme court rules are not mere suggestions but are compulsory. *U.S. Bank Trust National Ass'n v. Junior*, 2016 IL App (1st) 152109, ¶ 17.

¶ 42                    A. The Court Did Not Reform the Parties' Contracts

¶ 43    Turning to the merits, the firm contends that the court improperly *sua sponte* reformed the parties' retainer agreements. We disagree. We conclude that the court construed the retainer agreements by considering unobjected-to parol evidence. Generally, although a plaintiff is barred from contradicting the terms of a written contract by parol evidence (*Vallarta v. Lee Optical of Missouri, Inc.*, 12 Ill. App. 3d 112, 115 (1973)), the court's consideration of such evidence is permissible where it is not objected to at trial (*Tolbird v. Howard*, 43 Ill. 2d 357, 362 (1969); *Daggett v. Gage*, 41 Ill. 465, 466 (1866)).

¶ 44    Here, plaintiffs, *without objection*, introduced parol evidence (1) to show that the parties intended the 20% fee to be based on the sale price of the property, (2) to contradict the $650,000 exclusion from the 20% fee, and (3) to establish that the monies paid to deRosset and Martonffy were excluded from the fee. This extrinsic evidence consisted of documents that the parties created over the years explaining their respective understanding of the agreements and of testimony amplifying on those documents. Consequently, even though the firm argues on appeal that the retainer agreements are unambiguous, the trial court properly considered the unobjected-to parol evidence. See *Steinberg v. Keepper-Nagel Real Estate Investments, Inc.*, 14 Ill. App. 3d 619, 621 (1973) (even where a contract term is clear and unambiguous, the court can consider parol evidence when not objected to at trial). Thus, we reject the firm's argument that the court improperly reformed the retainer agreements. We view that argument as merely the firm's attempt to avoid forfeiture of its right to invoke the parol evidence rule.

¶ 45                              B. The Court's Ruling Was Not Against the
                                       Manifest Weight of the Evidence

¶ 46        The attorney-client relationship is created only by a retainer or a fee paid. *Zych v. Jones*, 84 Ill. App. 3d 647, 651 (1980). Where the attorney and client enter into an express contract, the terms of the express contract control the compensation that is due to the attorney. *Wildman, Harrold, Allen & Dixon v. Gaylord*, 317 Ill. App. 3d 590, 601 (2000). An attorney's contingent fee agreement is contractual in nature. *Hernandez v. New Rogers Pontiac, Inc.*, 332 Ill. App. 3d 461, 465 (2002).

¶ 47        With respect to contingent fee agreements, Rule 1.5 (Fees) of the Illinois Rules of Professional Conduct of 2010 offers guidance. Ill. R. Prof'l Conduct (2010) R. 1.5 (eff. Jan. 1, 2010). The Illinois Rules of Professional Conduct of 2010 provide a comprehensive set of rules governing the professional conduct of Illinois attorneys. *Bennett v. GlaxoSmithKline LLC*, 2020 IL App (5th) 180281, ¶ 51. Solely in the spirit of guidance, and because these rules are not aspirational or mere suggestions but have the force and effect of law (*Bennett*, 2020 IL App (5th) 180281, ¶ 51 (citing *Bright v. Dicke*, 161 Ill. 2d 204, 210 (1995)), we reflect on the requirements of Rule 1.5(c). Rule 1.5(c) provides that a contingent fee agreement must be "in a writing signed by the client and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement." Ill. R. Prof'l Conduct (2010) R. 1.5(c) (eff. Jan. 1, 2010). Compliance with this rule helps to ensure that clients will not "be left with the unenviable choice of agreeing with his attorney's recollection of the fee agreement, or delaying receipt of his money pending resolution of a fee dispute." *In re Spak*, 188 Ill. 2d 53, 67 (1999).

¶ 48        In construing the provisions of a contract, the primary objective is to give effect to the parties' intent when the contract was made. *Owens v. McDermott, Will & Emery*, 316 Ill. App. 3d 340, 344 (2000). If the language in the contract is clear and unambiguous, the court must determine the parties' intent solely from the plain language of the contract without considering extrinsic evidence. *Owens*, 316 Ill. App. 3d at 344. Clear and unambiguous terms must be given their plain and ordinary meanings, and contracts must be interpreted as a whole, giving meaning and effect to each provision. *Owens*, 316 Ill. App. 3d at 344. Any ambiguity in the terms of a contract will be construed against the drafter. *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 479 (1998).

¶ 49        If the court finds that a contract is ambiguous, parol evidence may be considered to determine the parties' intent. *Shields Pork Plus, Inc. v. Swiss Valley Ag Service*, 329 Ill. App. 3d 305, 311 (2002). However, as noted, parol evidence can also be considered if not objected to at trial. *Shields Pork Plus*, 329 Ill. App. 3d at 312-13.

¶ 50        The parties disagree on the standard of review. The firm argues that no facts were in dispute and the interpretation of the retainer agreements is a question of law, requiring *de novo* review. See *Storino, Ramello & Durkin v. Rackow*, 2015 IL App (1st) 142961, ¶ 18 (interpretation of a contract is a question of law subject to *de novo* review). However, the firm acknowledges that this court may disagree and apply the manifest-weight-of-the-evidence standard of review. Plaintiffs argue that the court heard evidence and made factual determinations in its ruling. We agree. Contrary to the firm's representation, the facts were in dispute. The standard of review in a bench trial is whether the judgment is against the manifest weight of the evidence. *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Limited USA*, 384 Ill. App. 3d 849, 859 (2008). A judgment is against the manifest weight of the evidence where the opposite

conclusion is apparent or when the court's findings appear to be unreasonable, arbitrary, or not based on the evidence. *Chicago's Pizza*, 384 Ill. App. 3d at 859.

¶ 51            1. *The Court's Finding That the Property Is to Be*
*Valued When Sold Was Not Against the Manifest Weight of the Evidence*

¶ 52      The firm argues that the retainer agreements unambiguously provide that the amount of the 20% fee was to be determined as of the date of the shareholder settlement. Two retainer agreements are at issue. The first is between the firm, Taek Kim, and Youk Lee, and the second is between the firm and Ik Kim. The Taek Kim/Youk Lee agreement is in letter form on the firm's letterhead, dated June 20, 1996, and signed by Burke. The document states: "Pursuant to our several conferences, the following fee arrangement has been agreed to between each of you and this firm in connection with [the shareholder litigation]," and it lists five typewritten fee provisions: (1) "[a] nonrefundable $30,000 retainer fee against which attorney time will be billed monthly at the hourly rate of $200; plus"; (2) "[t]wenty percent (20%) of any recovery by settlement or judgment *excluding* the sum of $500,000 which represents the agreed upon combined value of the Camelot shares of stock currently in the names of your spouses" (emphasis in original); (3) "a cap on attorneys fees of $75,000 exclusive of the twenty percent (20%) recovery outlined *** above"; (4) "all costs advanced, including expert witness costs, will be billed and paid monthly, paralegal and clerk time will be billed at customary hourly rates ($55.00 per hour)"; and (5) "[t]his firm will not withdraw as counsel in the foregoing described litigation without the written consent of the clients. Mary Patricia Burns, Esq., is expressly retained as one of clients' counsel."[6] Burke concluded: "If the foregoing accurately describes our understanding, please indicate your acceptance of the above described fee arrangement in the space provided below ***." Taek Kim's signature appears opposite the handwritten date of "7-6-96," and Youk Lee's signature appears opposite the handwritten date of "7-8-96." Taek Kim added a typewritten notation: "7-8-96 Pursuant to our telephone call agreement, I have changed and initialed item (b) as shown. Please put your initial signature and return a copy to us." "Item (b)" is the $500,000 exclusion from the 20% fee. The typewritten figure "$500,000" is manually crossed out and replaced with the handwritten figure of $650,000. Burke, Taek Kim, and Youk Lee initialed and dated the change.

¶ 53      Similarly, Burke prepared the Ik Kim retainer agreement in letter form on the firm's letterhead, dated March 23, 2004. The document first recites that Ik Kim agrees to continue to employ the firm to represent him in the shareholder litigation. The document also recites that the previous fee agreement between Ik Kim and the firm was void. The document then states: "As of the signing of this agreement," Ik Kim "agrees to pay the [f]irm as attorneys fees and the [f]irm agrees to accept as attorneys fees and costs as follows." The document then lists two provisions: (1) "a sum equal to 20% of any recovery by settlement or judgment in the [shareholder litigation] excluding the sum of $325,000 which represents the agreed upon value of the Camelot shares of stock currently in the name of [Ik] Kim; and" (2) "all costs advanced, including expert witness fees, will be billed and paid monthly together with paralegal and clerk time at the customarily [*sic*] hourly rate of $75.00 per hour." The document further provides that the agreement does not apply to appeals. Ik Kim's signature appears on the document, opposite the handwritten date of "5-15-04."

_____

[6]In the original, the five provisions are labeled (a) through (e).

- 9 -

¶ 54    The only provision at issue in each retainer agreement is the 20% fee. The retainer agreements provide that the clients would pay 20% of any settlement of the shareholder litigation, minus a cash exclusion. At trial, the parties agreed that the 20% fee was to be calculated using the value of the property. Contrary to the firm's assertion, the retainer agreements are silent with respect to when that value was to be determined.

¶ 55    Burke testified that the value was to be determined as of the date of the shareholder settlement. Taek Kim testified that the date of valuation was when the property sold. The firm relies on *Hapaniewski v. Rustin*, 179 Ill. App. 3d 951 (1989), for the proposition that attorney fees are payable on the date of the underlying settlement. In *Hapaniewski*, the contingent fee agreement provided that the attorney would be paid a percentage of the funds that he collected in the underlying accident case. *Hapaniewski*, 179 Ill. App. 3d at 952. The underlying case settled for $12,000, but those funds were disbursed to the client's creditors pursuant to a writ of attachment that issued before the petitioner attorney perfected his attorney's lien. *Hapaniewski*, 179 Ill. App. 3d at 953. The client contended that he was not liable for attorney fees because the attorney never "collected" the $12,000, as the client never received the funds in hand. *Hapaniewski*, 179 Ill. App. 3d at 954. The appellate court disagreed and held that the funds were used for the client's benefit and were, therefore, collected. *Hapaniewski*, 179 Ill. App. 3d at 955.

¶ 56    *Hapaniewski* is readily distinguishable because the fee in that case was a percentage of a sum certain of money and, hence, was easily determinable on the settlement date. Here, the recovery was an interest in real property. At least for tax purposes, real property is valued at its fair cash value, which is estimated at the price that it would bring at a fair, voluntary sale. *Cook County Board of Review v. Property Tax Appeal Board*, 384 Ill. App. 3d 472, 480 (2008). That determination could have been made as of the date of the shareholder settlement by obtaining a mutually agreeable appraisal of the property's fair cash value as of the settlement date. Instead, Burke unilaterally used a 1999 appraisal. Because the court found that the 1999 appraisal was too remote, it determined that Burke's testimony failed to establish the value of the property.

¶ 57    In arguing that the court erred, the firm does not explain how a five-year-old appraisal and evidence of remote comparable sales established the property's value as of the settlement date of October 19, 2004. The firm argues that the court should have taken judicial notice that real estate prices were rising in the years after the 1999 appraisal was done, but the court could not have determined a specific value had it done so. The determination of whether evidence of comparable sales is too remote to be relevant is within the trial judge's discretion. *In re Estate of Lyons*, 98 Ill. App. 3d 995, 998 (1981). Here, it is also not clear that the sales were comparable, where they were of single-family residences and the property consisted of a horse breeding and boarding operation.

¶ 58    Similarly, the court can disregard an appraisal that is too remote. *Resolution Trust Corp. v. Holtzman*, 248 Ill. App. 3d 105, 114-15 (1993). In *Holtzman*, the defendants in a mortgage foreclosure action contested the sheriff's sale and sought a postsale hearing based on a 34-month-old appraisal of the property. *Holtzman*, 248 Ill. App. 3d at 114. The appellate court held that no postsale hearing is required where the allegation of unconscionability rests on an appraisal rendered remote in time. *Holtzman*, 248 Ill. App. 3d at 115. In *Holtzman*, the appraisal was less remote than the appraisal here. Although the context in *Holtzman* was

different from our case, we believe that the principle is the same: the court need not accept a remote appraisal as evidence of fair market value.

¶ 59    The firm asserts that it has an equitable lien on the recovery, citing *Achs v. Maddox*, 175 Ill. App. 3d 989, 994 (1988), in which this court held that a contingent fee agreement gave the petitioner attorneys an equitable lien on the proceeds of a personal injury suit. Even were we to agree that the firm has an equitable lien, the value of the property must be established before the amount of the lien can be ascertained.

¶ 60    The firm next argues that the court found that plaintiffs agreed to Burke's valuation. This is a misrepresentation of the record. In speaking of the 1999 appraisal, the court said: "The attorneys and parties *to the underlying litigation* may have agreed that that's the value for the purposes of settlement, *but for the purposes of this case* I don't believe that is dispositive." (Emphases added.) Thus, the court noted that the parties agreed to the appraisal for purposes of settling the shareholder litigation. However, the court specifically stated that the 1999 appraisal was not binding for purposes of the present litigation.

¶ 61    The firm further argues that the clients did not object to Burke's valuation. This argument also is not supported by the record. The clients did not sign the fee statement. Then, in March 2011, Taek Kim wrote to Burke, stating that there was never a set dollar amount agreed to and that the presumption was that the 20% would be paid when the property was sold. Although Burke claimed that Taek Kim agreed to the $6 million gross settlement figure in writing, no such document exists in the record. We note that this controversy would have been avoided if, in drafting the retainer agreements and the addendum, the firm had paid special heed to Rule 1.5(c) of the Illinois Rules of Professional Conduct of 2010, which requires that the writing spell out the method—in this case, the timing—by which the fee is to be determined. The record shows that Taek Kim accepted an offer of approximately $6 million to sell the property, which did not result in a closing. That aborted transaction was not an affirmation of Burke's calculations.

¶ 62    The firm asserts that the addendum confirmed the clients' agreement to pay a fee of $1,037,262. However, at trial, Burke conceded that the document did not include that figure. Taek Kim explained that the clients knew that they owed a fee and felt obligated to pay something when Burke asked them for cash. Taek Kim testified that he estimated that the eventual fee would be approximately $500,000.

¶ 63    Further, Burke's own correspondence affirmed that the fee was 20% of the sale price of the property. He sent 20% demands to the clients on February 9, 2011, December 5, 2013, and July 17, 2014: "As you know consistent with our fee agreements (copies of which I enclose herewith) *this firm is entitled to 20% of the sale price of the Camelot property* less certain offsets." (Emphasis added.) These letters are inconsistent with the fee statement and the firm's monthly billings, but they are consistent with Taek Kim's testimony. At oral argument, the firm initially conceded the inconsistency but then argued that the language "20% of the sale price" meant "the balance of the $1 million fee is due when the property is sold." Giving the language its plain and ordinary meaning, "20% of the sale price" is 20% of whatever the property fetches when it is sold.

¶ 64    Whether the fee was to be paid as of the settlement date or when the property is sold is a question of fact. The credibility of the witnesses is for the trier of fact to determine. *Chicago Title Land Trust Co. v. JS II, LLC*, 2012 IL App (1st) 063420, ¶ 31. Here, by finding that the fee is to be calculated when the property is sold, the court not only rejected Burke's

methodology, but it implicitly found Taek Kim more credible than Burke. Where the testimony is contradictory, the trial judge, as the trier of fact, is in a superior position to this court to weigh the witnesses' credibility, weigh the evidence, and determine the preponderance thereof. *Chicago Title*, 2012 IL App (1st) 063420, ¶ 31. There simply is nothing in the record that supports Burke's testimony that the clients agreed to pay a $1,037,262 fee. Accordingly, we cannot say that the court's finding that the value of the property must be determined when the property is sold was against the manifest weight of the evidence.

¶ 65                              2. *The Exclusion of 50% of the Sale Price Was Not*
                                 *Against the Manifest Weight of the Evidence*

¶ 66       The parties agreed that the clients' existing interest in Camelot should be excluded from the 20% fee. It is undisputed that Taek Kim initialed the figure $650,000 in the retainer agreement and that Ik Kim agreed to an exclusion of $325,000. Burke testified that the clients proffered the $650,000 amount, while Taek Kim testified that Burke suggested that figure. At trial, both parties agreed that the clients' existing interest in Camelot was 50%.[7] In its ruling, the court found that the clients were entitled to an exclusion of 50% based on the sale price of the property, rather than $325,000 each. On appeal, the firm argues that the parties intended to exclude a specific dollar amount from the 20% fee and that the court was without authority to substitute 50%.

¶ 67       Burke and Taek Kim both testified that the $650,000 exclusion was agreed to in the final iteration of the retainer agreement. However, Taek Kim, testified, without objection, that $650,000 was an arbitrary number that Burke chose, which undervalued the clients' 50% interest in Camelot. The clients argued, and the court found, that the clients should not pay a fee for recovery of what they already owned. On appeal, the firm does not quarrel with this proposition, but it contends that the parties agreed that $325,000 per client represented their interest.

¶ 68       The firm cites *Suburban Bank of Hoffman-Schaumburg v. Bousis*, 144 Ill. 2d 51 (1991), which stands for the proposition that equity cannot make a new agreement for the parties under the guise of reforming the one that they made, nor can it be used to add a new provision to the contract. *Suburban Bank*, 144 Ill. 2d at 60. The firm also cites *Biskupski v. Jaroszewski*, 398 Ill. 287 (1947), which was a chancery suit to reform a written real estate contract. Those cases are inapposite, as we have already determined that the court in our case did not reform the retainer agreements, but properly considered unobjected-to parol evidence. See *Dremco, Inc. v. Hartz Construction Co.*, 261 Ill. App. 3d 531, 534 (1994) (evidence violating the parol evidence rule can be considered if not objected to at trial). Here, Taek Kim's testimony contradicted the written retainer agreement, but his testimony was introduced without objection. The only evidence linking the cash exclusion of $325,000 per client to the value of the property was Burke's valuation, which the court reasonably rejected. Thus, $650,000 did not represent the true value of the clients' 50% interest, which cannot be determined until the sale of the property. Accordingly, we cannot say that the court's ruling was against the manifest weight of the evidence.

---

[7]The parties treat the clients' interest in the corporation and the property as the same thing.

¶ 69                    3. *The $206,000 Exclusion From Fees Was Not*
                        *Against the Manifest Weight of the Evidence*

¶ 70        In addition to excluding the clients' 50% ownership of Camelot from the 20% fee, the court also excluded $415,000, representing the clients' payments to deRosset and Martonffy as part of the shareholder settlement. The court also ordered that the clients were entitled to an exclusion of $206,000, which plaintiffs paid to deRosset in the shareholder settlement.

¶ 71        The firm points out that the only exclusion in the retainer agreements is for the clients' existing interest in Camelot. The firm, however, acknowledges that it credited the clients with $415,000 in its fee statement. On appeal, the firm argues only that the court erred in excluding the $206,000 that Camelot paid to deRosset. The firm maintains that this exclusion was against the manifest weight of the evidence because the money was in Camelot's checking account and was not a cash payment out of the clients' pockets. The firm also notes that the court did not mention this $206,000 exclusion in its oral ruling.

¶ 72        At trial, Taek Kim testified that one of the reasons that the clients did not agree to the firm's fee statement is that the statement omitted the $206,000 credit for the clients' payment to deRosset. Thus, there was evidence at trial concerning this payment. Also, the shareholder settlement corroborates this payment. In its ruling, the court found that the clients were entitled to an exclusion for the monies that they paid to deRosset in the shareholder settlement. As noted, the record establishes that the clients paid deRosset $206,032. Further, the fact that the money was housed in Camelot's checking account rather than deposited into an escrow at the closing of the shareholder settlement cannot make a difference, as it was still cash that the clients transferred to deRosset in exchange for her exit from Camelot. The firm relies on *Christ v. Rake*, 287 Ill. 619 (1919), but that case involved the reformation of a lease and is inapplicable. Accordingly, we cannot say that the court's exclusion of the $206,000 was against the manifest weight of the evidence.

¶ 73                                III. CONCLUSION
¶ 74        For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

¶ 75        Affirmed.